[Cite as *In re E.H.*, 2019-Ohio-2572.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE E.H.

                           :          No. 107614

A Minor Child             :

                           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 27, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-17119186

---

*Appearances:*

Mark A. Stanton, Cuyahoga County Public Defender, and Britta M. Barthol, Assistant Public Defender, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael A. Short, Assistant Prosecuting Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, E.H., appeals the trial court's judgment denying his motion to suppress and his delinquency adjudication for criminal trespassing. He raises two assignments of error for our review:

The trial court erred when it adopted the magistrate's order denying the appellant's motion to suppress evidence.

The evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that appellant was guilty of criminal trespass.

{¶ 2} Finding no merit to his arguments, we affirm.

## I. Procedural History and Factual Background

{¶ 3} In December 2017, E.H. was charged with three counts, including one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a fourth-degree felony, having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony, and criminal trespass in violation of R.C. 2911.21(A)(1), a fourth-degree misdemeanor.

{¶ 4} E.H. moved to suppress the evidence against him. At the evidentiary hearing on his motion, the following evidence was presented to a magistrate.

{¶ 5} Tanya Williams testified that on December 21, 2017, she was at her boyfriend's house at 62 Avalon Drive, Bedford, Ohio. She saw two young men walking past her boyfriend's house and did not think anything of it until she saw the males cross the street and head to the neighbor's house directly across the street at 63 Avalon Drive, Bedford, Ohio. Williams said that one of the males crossed through the neighbor's yard and one of them walked up the neighbor's driveway. Williams further testified that one of the males "had his arms like in a crouching position as if they were sneaking up" on the neighbor. She then called 911. Williams said that one of the young males was wearing a gray "hoodie," and one was wearing a black or navy blue "hoodie."

{¶ 6}   When asked why she called 911, Williams explained:

Well, initially they walked past our house and it was probably maybe 15 seconds later our neighbor had already pulled in her yard and not 15 seconds after they passed our house, they crossed the street on her side of the street, walked past her house and turned around and that's when I saw one young man crossing across the line moving kind of quickly and the other was coming up the driveway.

{¶ 7}   Williams stated that her neighbor had just pulled in her driveway and was "unloading groceries or something out of her car and she had her back turned." Williams stated that the males got within approximately 12 feet of her neighbor.[1] Williams's boyfriend "was just standing on the front porch looking" at the two males.

{¶ 8}   Williams's 911 call was played in court.  In the 911 call, Williams states at the beginning that "two black males just tried to carjack our neighbor."  Williams further told the operator that the males were wearing a gray hoodie and a black hoodie.  Williams stated on the call that she and her "husband" watched the two males cross the street and approach their neighbor, who had just pulled into her driveway.  Williams told the 911 operator that the neighbor did not even know that the men were there.  Williams said that her "husband" walked out on their front porch and told them to "keep walking."  Williams said that the males were "on Avalon right now" walking toward Columbus Street.

---

[1] She testified 12 feet, but the state continued to ask her to describe the distance. The state apparently stood somewhere in the courtroom and asked Williams if the woman was "about this far?"  Williams said a little farther.  The state requested the court to let the record reflect that the males were about 15 to 20 feet away from the woman, but defense counsel objected, and the court sustained the objection.

{¶ 9} On cross-examination, Williams admitted that she never told the 911 operator that one of the males was in a "crouching" position or "sneaking" up on her neighbor. Williams further agreed that she did not give any other descriptive information about the two men to police.

{¶ 10} Detective Shawn Klubnick of the Bedford Police Department testified that around 4:00 p.m. on December 21, 2017, he was driving an unmarked car with Lieutenant Stask, supervisor of the detective bureau, when they received a dispatch of "a possible carjacking happening on Avalon." When they received the call, they were looking for a vehicle in the area of "Berwyn, Avalon, and Marion," which is near Bedford High School. He said that the dispatcher gave the description of the two men as "two young black males wearing a light gray sweatshirt and a dark sweatshirt."

{¶ 11} Detective Klubnick stated that they learned from the dispatch that the males were "traveling towards Columbus" Road, which was the same direction that Detective Klubnick and Lieutenant Stask were "traveling on Berwyn." Detective Klubnick testified that "within a minute or two" of hearing the dispatch, Lieutenant Stask told Detective Klubnick that he saw "two males matching the description coming up towards [them] on Berwyn on the sidewalk walking together." Detective Klubnick stated that Berwyn Drive was "very close to Avalon." After they drove about "another ten feet," Detective Klubnick also saw two males wearing a "light gray sweatshirt and a dark colored sweatshirt" walking toward the officers' direction.

{¶ 12} Detective Klubnick testified that he stopped the unmarked police vehicle "about 50 feet in front" of the males, and they waited for the males to "walk a little closer" toward them. When the two males "got closer," Detective Klubnick and Lieutenant Stask got out of their vehicle, identified themselves as police officers, ordered the males to take their hands out of their pockets, and to get on the ground. Detective Klubnick had his gun in his hand, but at his side. He referred to it as "low ready." Detective Klubnick could not recall where Lieutenant Stask's gun was when they ordered the two males to the ground. The males complied with the officers' orders.

{¶ 13} When asked what they did next, Detective Klubnick stated that they handcuffed the males and searched them. While searching E.H., Detective Klubnick found what felt like a "weapon" in the "crotch" of E.H.'s pants. Detective Klubnick asked E.H. what it was and he responded, "a gun." Detective Klubnick and Lieutenant Stask then waited for patrol officers, who arrived in another couple of minutes. Patrol officers transported E.H. and the other male to the police station.

{¶ 14} On direct examination, Detective Klubnick did not specify when he arrested E.H. On cross-examination, he agreed that "within a minute of hearing the call," he and Lieutenant Stask "hop[ped] out of [their] car and arrested them." On redirect examination, the state asked Detective Klubnick, "Regarding the procedure, you said you got out on cross-examination, you ordered them to the ground[,] [a]t that point were they under arrest for any offense at that specific point?" Detective Klubnick responded, "Not at that specific point, no." The state went on to ask, "So

at what point did you decide to place [E.H.] under arrest?" Detective Klubnick replied, "When the gun was found."

{¶ 15} Detective Klubnick agreed on cross-examination that when they ordered the two males to the ground, "all [he] knew about what allegedly took place was what [he] heard on dispatch." He explained on redirect examination that based upon the call of a possible carjacking, he had reason to believe that the males were "possibly armed, dangerous and violent."

{¶ 16} In response to the court's questioning, Detective Klubnick stated that he did not see anyone else walking on the street when he saw E.H. and the other young male. He agreed that it was common to see young males walking together in this area because it was near Bedford High School.

{¶ 17} At the close of the evidence, the magistrate recommending denying E.H.'s motion to suppress. E.H. filed a motion to set aside the magistrate's order pursuant to Juv.R. 40(D). The trial court overruled E.H.'s motion and adopted the magistrate's decision. The trial court continued the matter for trial, which was held a couple of weeks after the suppression hearing.

{¶ 18} The trial court found E.H. delinquent of all charges. The trial court then ordered that for carrying a concealed weapon, E.H. should be placed in the legal custody of the Ohio Department of Youth Services for an indefinite term of six months to a maximum "period not to exceed" the age of 21 years old, but the court then suspended this sentence. For having a weapon while under disability, the court placed E.H. in the custody of "probation officer, for placement at Glen Mills School"

in Pennsylvania.  The court ordered that upon termination of placement at Glen Mills, E.H. was "to participate in aftercare supervision programming, subject to the rules of probation of this court."  For criminal trespassing, the court ordered that E.H. be "credited with time served."  It is from this judgment that E.H. now appeals.

## II. Motion to Suppress

{¶ 19} In his first assignment of error, E.H. argues that the trial court erred when it denied his motion to suppress.  He raises three issues within this assigned error: (1) his "seizure" amounted to an arrest without probable cause, (2) assuming that his seizure was an investigatory stop, the officers lacked reasonable suspicion to investigate because the citizen's "tip was insufficient to create reasonable suspicion to justify the stop," and (3) assuming the officers had reasonable suspicion to stop him and investigate, they did not have reasonable suspicion to pat him down.

{¶ 20} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact.  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 7, ¶ 8.  This court accepts the trial court's findings of fact if they are supported by competent, credible evidence.  *Id.*  Accepting these facts as true, this court must independently determine, as a matter of law and without deference to the trial court's conclusion, whether those facts meet the applicable legal standard.  *Id.*

{¶ 21} We will address E.H.'s second issue first for ease of discussion.

{¶ 22} The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures."  The Fourth Amendment is applicable to the states by way of the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).  Searches and seizures conducted outside of the judicial process, without a warrant based on probable cause, are per se unreasonable, unless they come within one of a few well-established exceptions.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  If evidence is obtained through actions that violate a person's Fourth Amendment rights, exclusion of the evidence is mandated.  *Mapp* at syllabus.

{¶ 23}  An officer may perform an investigatory stop without violating the Fourth Amendment as long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  The reasonable suspicion necessary for such a stop eludes precise definition.  It has been described by courts as requiring more than an inchoate suspicion or a "hunch," but less than the heightened level of certainty required for probable cause.  *State v. Shepherd*, 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997).  Rather than involving a strict, inflexible standard, determination of whether reasonable suspicion exists in any given case requires review of the totality of the surrounding facts and circumstances.  *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph one of the syllabus.  Those circumstances must be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to

events as they unfold. *State v. Andrews*, 57 Ohio St.3d 86, 89, 565 N.E.2d 1271 (1991).

{¶ 24} The "'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The "reasonableness" determination hinges upon objective factors, not the actual subjective motivation of the officer or officers involved. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

{¶ 25} E.H. maintains that the "officers did not have an independent factual basis for stopping" him. The officers, however, were acting upon a dispatch that they had had just received that two young black males had possibly committed a carjacking on Avalon Drive and were walking up Avalon toward another road. One to two minutes later, the officers saw two males matching that description walking on a street very close to Avalon Drive. The Ohio Supreme Court has held that "where an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." *Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999), paragraph one of the syllabus.

{¶ 26} The Supreme Court explained in *Weisner* that informants typically fit into one of three categories: the anonymous informant, the known informant, who is generally someone from the criminal world who has provided reliable tips in the past, and an identified citizen informant. *Id.* at 300. An anonymous informant is

generally considered relatively unreliable and requires independent police corroboration. *Id.* But a tip from a known informant — an identified citizen informant — is afforded a greater degree of reliability. *Id.* at 301. The Supreme Court explained: "We believe that greater credibility may be due an informant * * * who initiates and permits extended police contact rather than one who phones in a tip and retreats from any further police interaction." *Id.* at 302.

{¶ 27} A determination of the reasonableness of a stop under *Weisner*, just as any investigatory stop, "involves a consideration of 'the totality of the circumstances.'" *Id.* at 299, citing *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). "Under this analysis, 'both the content of information possessed by police and its degree of reliability' are relevant to the court's determination." *Id.*, quoting *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Thus, where the only information possessed by police prior to the stop is from an informant's tip, "the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip," specifically, "whether the tip itself has sufficient indicia of reliability to justify the investigative stop." *Id.* The most important factors in determining the reliability of an informant's tip are "the informant's veracity, reliability, and basis of knowledge." *Id.*, citing *White*.

{¶ 28} According to the facts in *Weisner*, the police received a call from an identified citizen who gave his name and cell phone number. The caller reported "a suspected crime of drunk driving in progress." *Weisner,* 87 Ohio St.3d at 295, 720

N.E.2d 507. The caller stated that he was following the vehicle in question, reported the make, model, and license plate of the car, and "described it as 'weaving all over the road.'" *Id.* The *Weisner* court observed that the informant made his report from the perspective of a motorist sharing the road with an impaired motorist who posed a threat to the informant and to other motorists. *Id.* at 300. In view of this factual predicate, the court concluded that the informant had a high degree of credibility and therefore, "the dispatch based upon [the informant's] tip was issued on sufficient facts to justify [the arresting officer's] investigative stop." *Id.* at 303.

{¶ 29} Credibility, however, is only one criteria. *See Weisner* ("categorization of the informant as an identified citizen informant does not itself determine the outcome of this case[;] [i]nstead it is one element of our totality of the circumstances review of this informant's tip, weighing in favor of the informant's reliability and veracity"). As this court stated in *State v. Cisternino*, 8th Dist. Cuyahoga No. 94674, 2010-Ohio-6027, "[e]very time a citizen informant reports what he or she considers suspicious activity," the police are not "given carte blanche to stop and search an alleged suspect." *Id.* at ¶ 19. Rather, the citizen informant must give sufficient detail — specific and articulable facts — to warrant intrusion on an individual's Fourth Amendment rights. *See United States v. Hensley*, 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ("If the [dispatch] has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.").

{¶ 30} Viewing the totality of the circumstances in this case through the eyes of a reasonable and prudent police officer, we conclude that Williams's information amounted to sufficient "specific and articulable facts" that formed an objective basis for suspecting that a person has committed or is about to commit a crime. In this case, the concerned citizen identified herself in her 911 call to police and gave her telephone number. Thus, we have no issue with her credibility, veracity, or reliability. Williams then explained in the 911 call that "two black males just tried to car jack our neighbor." When further describing what she saw, Williams stated that she and her "husband" watched the two males cross the street and approach their neighbor, who had just pulled into her driveway. One male crossed her neighbor's yard and one male began to walk up her neighbor's driveway. Williams told the 911 operator that the neighbor did not even know that the men were there. Williams then said that her "husband" walked out on their front porch and told them to "keep walking," and the males left her neighbor's property and began walking on Avalon Drive toward Columbus Road. Williams's information gave the dispatcher sufficient indicia of reliability and details to justify the investigative stop of the males. *See Weisner* at 299.

{¶ 31} Because we have determined that the tip contained sufficient indicia of reliability and veracity such that it afforded reasonable suspicion to the officers, we must next address E.H.'s first issue and determine whether his "seizure" amounted to an arrest without probable cause rather than just a *Terry* stop to investigate.

{¶ 32} It is settled law that a person arrested without probable cause violates the Fourth Amendment. *State v. Mauer*, 15 Ohio St.3d 239, 254, 473 N.E.2d 768 (1984). "The magic words 'you are under arrest' are not necessary to constitute an arrest." *Id.* "Any police confinement beyond the parameters in *Terry* * * * is the key to what constitutes an arrest." *Id.*

{¶ 33} E.H. argues that because Detective Klubnick exited his vehicle with his gun at his side, immediately ordered him to the ground, and handcuffed him, Detective Klubnick "demonstrated his intent to arrest [him]." E.H. further maintains that he was "seized" for purposes of effectuating an arrest. In support of his argument that he was seized, E.H. points to *State v. Nelson*, 72 Ohio App.3d 506, 595 N.E.2d 475 (8th Dist.1991), which held:

> The existence of an arrest is dependent upon the existence of four requisite elements: "(1) An intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested."

*Id.* at 508, quoting *State v. Barker*, 53 Ohio St.2d 135, 372 N.E.2d 1324 (1978), *cert. denied*, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978).

{¶ 34} *Nelson* is distinguishable from the facts in this case. Although we did find that handcuffing the defendant "under the circumstances" in that case amounted to a seizure, we found that the defendant's arrest was improper because there was no probable cause. *Id.* at 509. We explained:

> [Detective] Campbell's observations of Nelson did not warrant a prudent man in believing a felony was in progress. Campbell stated that he observed a group of people standing in front of an apartment in

a high crime area. He observed the movement of hands without anything being exchanged. Upon the police's arrival, the group dispersed and Nelson was found sitting in a puddle on the third floor porch. Nelson and the female juvenile told Campbell that they had been engaged in an argument. Nelson's behavior did not give rise to a reasonable inference that he was a participant in a felony. *Sibron v. New York* (1968), 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917. Based on the totality of the circumstances, we find that Campbell did not have probable cause to believe Nelson was committing or had committed a drug offense. As a result, the discovery of drugs subsequent to such arrest was improper. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

*Id.* at 508.

{¶ 35} The fact that E.H. was not free to leave "was not outcome determinative. No suspect is ever 'free to leave' an investigatory stop." *State v. Raine*, 8th Dist. Cuyahoga No. 90681, 2008-Ohio-5993, ¶ 22, quoting *State v. Martin*, 2d Dist. Montgomery No. 19186, 2002-Ohio-2621 (*Raine* addressed whether a suspect was arrested and "in custody" for *Miranda* purposes). Indeed, a police officer may restrain an individual's movement with handcuffs even during a *Terry* stop if the facts warrant it. This court has stated:

> There is no bright line rule either prohibiting or endorsing officers handcuffing individuals during *Terry* stop situations. Under *State v. Lozada*, 92 Ohio St.3d 74, 78, 2001-Ohio-149, 748 N.E.2d 520, the protection of an officer and the individual is a legitimate reason to infringe upon the liberty of an individual. However, the means used to restrain the liberty of the individual must be reasonable under the circumstances. *State v. Dabney*, Belmont App. No. 02BE31, 2003-Ohio-5141.

*State v. McKinney*, 8th Dist. Cuyahoga No. 83722, 2004-Ohio-4356, ¶ 29 (Gallagher, J., concurring).

{¶ 36} "Force may be used, even in the form of handcuffs, during a *Terry* stop if it is reasonably necessary and is limited in scope and duration." *State v. White*, 2d Dist. Montgomery No. 18731, 2002 Ohio App. LEXIS 145, 18 (Jan. 18, 2002), fn. 1, citing *United States v. Chavez*, 812 F.2d 1295, 1301 (10th Cir.1987), and *United States v. Bautista*, 684 F.2d 1286 (9th Cir.1982). "Handcuffing a suspect in the course of an investigative detention does not necessarily turn that investigative detention into an arrest, so long as handcuffing is reasonable under the circumstances; for instance, to maintain the status quo and prevent flight." *State v. Carter*, 2d Dist. Montgomery No. 21145, 2006-Ohio-2823, ¶ 20.

{¶ 37} "Handcuffing generally only occurs during a *Terry* stop if the individual is dangerous or resisting the officers and it is necessary to complete the frisk." *White* at 18, fn. 1.

> "Whether handcuffing or other methods of detention are reasonable 'depends on whether the restraint was temporary and lasted no longer than was necessary to effectuate the purpose of the stop, and whether the methods employed were the least intrusive means reasonably available to verify the officers' suspicions in a short period of time.'"

*State v. Payne*, 2d Dist. Montgomery No. 13898, 1994 Ohio App. LEXIS 1925, 4 (May 4, 1994), quoting *United States v. Glenna*, 878 F.2d 967 (7th Cir.1989).

{¶ 38} In this case, the officers ordered the suspects to the ground and to put their hands out, and then they handcuffed them. But the officers were acting very quickly on a dispatch containing very little information except the description of the males and of a possible carjacking — which Detective Klubnick explained "does mean someone's probably armed, dangerous and violent." Detective Klubnick

further explained that their actions were for "officer's safety and the public's safety." Based upon these facts, we conclude that the officers' acts were reasonable under the circumstances and provided them the means to search the males for weapons, which addresses E.H.'s third issue presented as well (where he argued that assuming the officers had reasonable suspicion to stop him and investigate, they did not have reasonable suspicion to pat him down). The officers certainly had reasonable suspicion to pat the males down acting on a dispatch of possible carjacking. Thus, E.H.'s first and third issues are without merit as well.

{¶ 39} Accordingly, E.H.'s first assignment of error is overruled.

## III. Sufficiency of the Evidence

{¶ 40} In his second assignment of error, E.H. argues that the state failed to present sufficient evidence to support his criminal trespassing delinquency adjudication beyond a reasonable doubt. We disagree.

{¶ 41} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 42} E.H. was found delinquent of criminal trespassing under R.C. 2911.21(A)(1), which provides that "[n]o person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another[.]" E.H. does not contest the elements of criminal trespassing. Rather, he maintains that the state failed to present sufficient evidence of his identity, namely, that he was one of the two males who walked onto Williams's neighbor's property at 63 Avalon Drive, Bedford, Ohio. He also contends that no one identified him out of or in court as the person who was on the property at 63 Avalon Drive, Bedford, Ohio.

{¶ 43} Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *Jenks* at 272-273. The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Further, a witness need not physically point out the defendant in the courtroom as long as there is sufficient direct or circumstantial evidence proving that the defendant was the perpetrator. *See Jenks* at 272-273.

{¶ 44} In this case, the state presented Williams and Detective Klubnick, who testified to essentially the same facts as they did at the suppression hearing. The state also presented Lieutenant Stask, who corroborated the events as told by Detective Klubnick, and Lawrence White, Jr., the owner of the home located at 63 Avalon Drive, Bedford, Ohio. White testified that E.H. was not permitted to be on his property.

{¶ 45} Regarding E.H.'s identity, Williams testified that she saw two young black males walk across her neighbor's lawn and up her driveway. Williams said that the males were wearing a black "hoodie" and a gray "hoodie," and that they were walking up Avalon Drive toward Columbus Road. Detective Klubnick and Lieutenant Stask testified that they were driving in the area where the suspects were reported as walking toward. Within a minute or two, the officers saw two males who matched the description given to them. Both officers testified in court that E.H. was the male who was wearing the gray "hoodie." This is sufficient, circumstantial evidence that E.H. was one of the two males who had just walked onto White's property without his permission.

{¶ 46} E.H.'s second assignment of error is overruled.

{¶ 47} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
LARRY A. JONES, SR., J., CONCUR