JOURNAL ENTRY and OPINION
{¶ 1} The State of Ohio appeals from the judgment of the Cuyahoga County Court of Common Pleas, which granted Markell Boulis' motion to suppress. On appeal, the State assigns the following error for our review:
"I. The trial court erred in granting defendant's motion to suppress when the totality of the circumstances clearly indicated a crime had occurred rendering the search of defendant permissible."
"II. The trial court erred in granting defendant's motion by denying the State's motion to dismiss defendant's motion to suppress on the basis of collateral estoppel."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's judgment. The apposite facts follow.
 {¶ 3} Boulis moved to suppress the illegally seized evidence. The State of Ohio filed a motion to dismiss Boulis' motion to suppress based on the doctrine of collateral estoppel. The substance of the State's argument is that when Boulis was arrested in Ohio, he was on probation in Georgia. Upon being returned to Georgia, he attempted to suppress from evidence the police search and seizure that occurred in Ohio. The Georgia court denied his motion. Upon being returned to Ohio, Boulis filed a motion to suppress a second time. The State filed its motion to dismiss based on collateral estoppel; the trial court disagreed, denied the State's motion, and conducted a suppression hearing.
 Suppression Hearing {¶ 4} At the suppression hearing, Officer Steven Havranek of the Cleveland Police Department testified that on June 11, 2003, he and his partner were on routine patrol in the area of West 80th Street and Detroit Avenue because of complaints about drug activity. According to Officer Havranek, at approximately 12:30 a.m., they were traveling westbound on Detroit Avenue when they observed a male on a bicycle traveling eastbound in the direction of West 80th Street. A Mercedes SUV driven by Boulis pulled alongside the male on the bicycle and both came to a stop at West 80th Street and Detroit Avenue. The male on the bicycle leaned into the passenger's window of the Mercedes SUV, conversed with Boulis, and pointed south of West 80th Street. Both Boulis and the man on the bicycle then proceeded to turn south onto West 80th Street.
 {¶ 5} Officer Havranek turned the zone car around, proceeded eastbound on Detroit Avenue and stopped in the middle of the intersection of West 80th Street. From the middle of the intersection, Officer Havranek observed Boulis and the male on the bicycle talking to each other. Officer Havranek stated that when Boulis and the male on the bicycle noticed the patrol car, the male on the bicycle began pointing in different directions. The male on the bicycle then proceeded southbound toward Elsa Court and Boulis walked back to his vehicle.
 {¶ 6} Officer Havranek drove around the block and came to Elsa Court and West 80th Street, where he observed Boulis standing behind his SUV talking to the male on the bicycle. Officer Havranek stated that he and his partner were positioned at an angle about 75-100 feet away. Officer Havranek stated that he was watching Boulis and the male on the bicycle with his naked eye, while his partner used binoculars. Officer Havranek testified as follows about the ensuing events:
"A. I observed the male on the bicycle reach into his mouth. He had an open palm, open hand, and with his other hand he seemed to be picking at some objects and showing them to Mr. Boulis.
Q. What occurred next?
A. Then the male on the bicycle handed those objects to Mr. Boulis and Mr. Boulis handed him something in return.
Q. From your vantage point were you able to see what either party handed to each other?
A. No, we couldn't see what was handed.
Q. How about your partner with the binoculars, could he see what was handed to either?
A. No.
Q. Afer you observed this trade of objects what did you do?
A. Well, then believing that we had just observed a drug transaction, we approached them in our marked zone car, pulled right behind the SUV."
"* * *
"A. We pulled our zone car behind the SUV. They didn't see us until we got right on them and they seemed startled. I exited the drivers side of the zone car. My partner exited the passenger side. My partner approached the male on the bicycle.
Q. And who did you engage?
A. Mr. Boulis. Mr. Boulis was walking toward the driver side of his vehicle at this point after I got out of the zone car.
Q. How did you proceed?
A. Well, I noticed that his right hand was kind of clinched, almost in a fist. I asked him to come back toward me. He did. I'm sorry.
Q. Go ahead.
A. He turned around, but when he turned around he hid his right hand behind his body.
Q. If you could stand and describe for the judge the manner in which he was doing this.
A. When he turned around he had his hand behind his body. I asked what he had in his hand. He wouldn't answer. I tried to position to look behind his body. Every time I would, like he turned his body away from me and kept his hand behind him. I must have asked him at least three times what he had in his hand.
Q. What did he do in response?
A. Finally he put a quick move into the right front pant pocket, pulled his hand out, and said, "I don't have anything."
Q. What did you do in response to that?
A. I asked him to put his hand on the car. He did. I then patted him down and felt in his right front pants pocket what was immediately apparent to me as being substances, objects, consistent with a controlled substance."[1]
 {¶ 7} On cross examination, Officer Havranek testified as follows regarding the pat-down search:
"Q. And you agree with me that you testified on a prior date?
A. Yes.
Q. And you will agree with me that — let me ask you this: Have you reviewed your testimony in Georgia?
A. Yes, I have.
Q. When did you read it?
A. About a week ago probably.
Q. And when you read it, you saw in there that you clearly stated under oath that you were not afraid for your safety, didn't you?
A. And I also stated that today.
Q. So you didn't search Mr. Boulis because you were in fear of your safety, is that true or false?
A. I stated that today. I was not in fear for my safety."[2]
 {¶ 8} Officer Havranek testified that after he recovered three rocks of suspected crack cocaine from Boulis' right front pocket, he placed him under arrest. Further, Officer Havranek testified that he recovered a glass pipe with cocaine residue from Boulis' left front pants pocket after he placed Boulis under arrest. Finally, Officer Havranek testified that the lab results indicated that the three rocks of suspected crack were counterfeits.
 {¶ 9} At the conclusion of the hearing, the trial court granted Boulis' motion to suppress.
 Motion to Suppress {¶ 10} In the first assigned error, the State argues the trial court erred in granting Boulis' motion to suppress. We disagree.
 {¶ 11} An appeal of a trial court's ruling on a motion to suppress evidence involves mixed questions of law and fact. Initially, we note that in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.[3] Thus, the credibility of witnesses during a suppression hearing is a matter for the trial court. A reviewing court should not disturb the trial court's findings on the issue of credibility.[4] Accordingly, in our review we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.[5]
 {¶ 12} The Fourth Amendment to the Constitution of the United States and Section 14, Article, I, of the Constitution of Ohio, prohibit unreasonable searches of persons and seizure of their property. Evidence obtained by the State in violation of that prohibition must be suppressed from use by the State in its criminal prosecution of the person from whom it was seized. The purpose of suppression is not to vindicate the rights of the accused person, who may very well have engaged in illegal conduct, but to deter the State from such acts in the future.[6] The rule is also applied to protect the integrity of the court and its proceedings.[7]
 {¶ 13} Searches and seizures conducted without the authority of a prior judicial warrant are unreasonable per se, and therefore illegal.[8] The State may, nevertheless, prove that its warrantless search was not unreasonable, and thus not illegal, if the State demonstrates that its Officer acted according to one of several exceptions to the warrant requirement when the search and seizure was performed.[9] If the State meets that burden, suppression of the evidence seized is not proper.
 {¶ 14} A defendant who asks a court to suppress evidence because the officer seized it in the course of a warrantless search has the initial burden to prove that the search was warrantless. In practice, the State usually concedes the fact. The burden of going forward then passes to the State, which must present evidence sufficient to establish the existence of an exception to the warrant requirement that makes the seizure reasonable.[10]
 {¶ 15} One of the most frequently cited exceptions to the warrant requirement, is the exception announced in Terry v.Ohio.[11] Under Terry, a police officer who reasonably suspects that some specific criminal misconduct is afoot may briefly detain and question the person suspected, though the officer lacks a judicial warrant to do so. If the officer also reasonably believes that the suspect is armed and dangerous, the officer may perform a pat-down search of the suspect's outer garments and an examination of other areas within the suspect's reach in which weapons that could be turned on the officer might be concealed. This search may not be for the purpose of locating evidence of the crime the officer suspects, but if it produces evidence of crime the officer may seize it, and it is not subject to suppression in the State's resulting criminal prosecution.
 {¶ 16} It should be noted that the level of suspicion required for a Terry stop is less demanding than that required to establish probable cause.[12] Probable cause has been defined as "a fair probability that contraband or evidence of a crime will be found."[13]
 {¶ 17} In order to justify an investigative stop underTerry, a police officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.[14] The Fourth Amendment requires a minimal level of objective justification for making the stop.[15]
 {¶ 18} The United States Supreme Court has held since an effort to define "reasonable and/or articulable suspicion" creates unnecessary difficulty, that when evaluating the validity of a stop such as this, a court must consider "the totality of the circumstances — the whole picture."[16] Further, the totality of the circumstances must be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.[17]
 {¶ 19} In the instant case, the trial court's journal entry reads as follows:
"After hearing and evidence presented, the court grants defendant's motion to suppress. All of the evidence shows that the search under Terry v. Ohio was not intended as a search for weapons; it was used to carry out a search for contraband without a warrant and without the burden of probable cause. This ruling follows the analysis and holding of State v. Clark,139 Ohio App.3d 183 (8th Dist. 2000); State v. Bradley (1995), WL 662, 109 (8th Dist.); and State v. Evans, 67 Ohio St.3d 405
(1993)."
 {¶ 20} Our review of the record before us confirms the trial court's reasoning and judgment. The record fails to indicate that the stop of Boulis was supported by the specific, articulable facts necessary to perform an investigative stop under Terry.
First, Officer Havranek admitted that observing someone driving an SUV who stops to speak to someone riding a bicycle is benign.[18] Second, although Officer Havranek testified that they observed what they believed to be a drug transaction, he admitted that he and his partner were situated approximately 100 feet away. Further, Officer Havranek testified that he observed the transaction with the naked eye while his partner used binoculars, but neither of them could see what was exchanged between Boulis and the man on the bicycle. Officer Havranek could not state with specificity or certainty that he observed drugs and money being exchanged between Boulis and the man on the bicycle. Based on these facts, we conclude that the officers initiated the stop on the mere hunch that a drug transaction had taken place.
 {¶ 21} We also conclude from the facts surrounding the frisk that Officer Havranek was conducting more than a pat-down search to assure that Boulis was unarmed. The record before us reveals that Officer Havranek testified in two separate proceedings that he did not search Boulis because he was in fear of his safety. Moreover, Officer Havranek testified that when he conducted the pat-down search, he was able to feel the three small pieces of suspected crack cocaine in Boulis' right front pocket. Yet, during the same pat-down search, Officer Havranek failed to discover the glass pipe in Boulis' left front pocket. Rather, the glass pipe in Boulis' left front pants pocket was found only after a search incident to his arrest. This patently demonstrates that the officer, prior to effectuating an arrest, initially patted-down Boulis to locate and seize evidence rather than to determine if Boulis was armed.
 {¶ 22} In the instant case, the trial court determined that as a factual matter, the officers acted on a hunch. The trial court's factual finding is supported in the record by the testimony of Officer Havranek who indicated in two separate forums that when he conducted the pat-down search he was not in fear of his safety. Consequently, the evidence seized is fruit from a poisonous tree. Accordingly, we overrule the State's first assigned error.
 Collateral Estoppel {¶ 23} In the second assigned error, the State argues that the trial court erred in denying their motion to dismiss Boulis' motion to suppress on the basis of collateral estoppel. We disagree.
 {¶ 24} In the criminal context, collateral estoppel exists "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."[19]
Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law for nearly 80 years. Today, it is also viewed as embodied in theFifth Amendment guarantee against double jeopardy.[20] The doctrine of collateral estoppel and the guarantee against double jeopardy of the Fifth Amendment are applicable to the states through the Fourteenth Amendment to the United States Constitution.[21]
 {¶ 25} The Ohio Supreme Court has interpreted this doctrine to require mutuality among the parties.[22] The application of the concept of collateral estoppel requires an identity of both parties and issues.[23]
 {¶ 26} The United States Supreme Court mandates two inquiries in determining whether the doctrine of collateral estoppel applies. First, what facts were necessarily determined in the first trial? Second, has the government in a subsequent trial tried to re-litigate facts necessarily established against it in the first trial?[24]
 {¶ 27} In deciding a motion to bar prosecution on the basis of collateral estoppel, a court must consider all of the following:
"1. Whether a final judgment had been rendered in the first proceeding;
2. Whether there are issues present in both proceedings which are sufficiently similar and sufficiently material;
3. Whether, after an examination of the record of the initial proceeding the issues were actually litigated in the first case;
4. Whether, after an examination of the record of the first proceeding, the issues were necessarily decided in the first case; and
5. Whether there is privity between the parties in both proceedings."[25]
 {¶ 28} A review of the record before the court in this case reveals that the response to all but the last of the afore stated considerations is "yes." Although law enforcement officers from Ohio participated in Boulis' probation violation hearing in the State of Georgia, the State of Ohio was not a party to that proceeding. Thus, without mutuality of the parties, the doctrine of collateral estoppel does not preclude the Ohio proceeding.[26] Further, without mutuality of parties, the prior adjudication of Boulis as a probation violator in the State of Georgia, cannot be asserted against the State of Ohio.
 {¶ 29} Moreover, the doctrine of collateral estoppel does not apply to bar a second motion to suppress because the ruling on the first motion was not a final appealable order.[27]
Thus, the trial court did not err in denying the State's motion to dismiss Boulis' motion to suppress evidence based on the doctrine of collateral estoppel. Accordingly, we overrule the second assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant his costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr. P.J., and McMonagle, J., concur.
[1] Tr. at 18-23.
[2] Tr. at 30-31.
[3] See State v. Robinson (1994), 98 Ohio App.3d 560; Statev. Rossiter (1993), 88 Ohio App.3d 162; State v. Lewis (1992),78 Ohio App.3d 518; State v. Warren (Aug. 12, 1991), 4th
Dist. No. 90CA7.
[4] See State v. Mills (1992), 62 Ohio St.3d 357; State v.Fanning (1982), 1 Ohio St.3d 19.
[5] See State v. Harris (1994), 98 Ohio App.3d 543.
[6] United States v. Calandra (1974), 414 U.S. 338; Stone v.Powell (1976), 428 U.S. 465.
[7] United States v. Payner (1980), 447 U.S. 727.
[8] Katz v. United States (1967), 389 U.S. 347.
[9] Id.; Coolidge v. New Hampshire (1971), 403 U.S. 443.
[10] Xenia v. Wallace (1988), 37 Ohio St.3d 216.
[11] (1968), 392 U.S. 1.
[12] United States v. Montoya de Hernandez (1985),473 U.S. 531.
[13] Illinois v. Gates (1983), 462 U.S. 213, 238.
[14] 392 U.S. at 27.
[15] INS v. Delgado (1984), 466 U.S. 210, 217.
[16] United States v. Cortez (1981), 449 U.S. 411, 417.
[17] State v. Andrews (1991), 57 Ohio St.3d 86, 87-88.
[18] Tr. at 31.
[19] Ashe v. Swenson (1970), 397 U.S. 436, 443,25 L.Ed.2d 469, 90 S.Ct. 1189. See, also, State v. Lovejoy (1997),79 Ohio St.3d 440, 443.
[20] Ashe, supra, at 445.
[21] Lovejoy, supra, at 443.
[22] Johnson v. Cleveland (Jan. 14, 1988), Cuyahoga App. No. 53241.
[23] Id.
[24] United States v. Mock (C.A.5, 1979), 604 F.2d 341, 343.
[25] City of Cleveland v. Hogan, 92 Ohio Misc.2d 34, citingGoodson v. McDonough Power Equip., Inc. (1983),2 Ohio St.3d 193. See, also, Howell v. Richardson (1989), 45 Ohio St.3d 365;Hainbuchner v. Miner (1987), 31 Ohio St.3d 133, 137, citingWright v. Schick (1938), 134 Ohio St. 193.
[26] Crooker v. United States, (1st Cir. 1980) 620 F.2d 313,314.
[27] See State v. Roberts (May 4, 1995), 4th Dist. No. 94 CA 2020, and State v. Chelikowsky (Aug. 18, 1992), 4th
Dist. No. 91 CA 27. See, also, generally, State v. Williams
(1996), 76 Ohio St.3d 290.