[Cite as *Parma v. Coyne*, 2024-Ohio-3192.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF PARMA,

     Plaintiff-Appellee,     :

                              :          No. 113407

     v.                       :

STEVE COYNE,

                              :

     Defendant-Appellant.

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 22, 2024

---

Criminal Appeal from the Parma Municipal Court
Case No. 23TRC02379

---

### *Appearances:*

Scott M. Tuma, Parma Chief Prosecutor/Law Director, and John L. Reulback, Jr., Assistant Prosecuting Attorney, *for appellee*.

Annotico Law, Inc. and Ronald A. Annotico, *for appellant*.

EMMANUELA D. GROVES, J.:

{¶ 1} Defendant-appellant, Steve Coyne ("Coyne"), appeals the trial court's decision denying his motion to suppress. Upon review, we affirm the trial court's judgment.

## I.  Facts and Procedural History

{¶ 2}  In February 2022, Coyne was pulled over and arrested by Parma Police Department Patrolman Matthew Bertole ("Officer Bertole"), who was responding to a 9-1-1 disturbance call made from an apartment on Stumph Road. Plaintiff-appellee, City of Parma ("City"), subsequently charged Coyne with operating a vehicle under the influence of alcohol or drugs in violation of R.C. 4511.19(A)(1) ("OVI"), a misdemeanor of the first degree.  Coyne pled not guilty.

{¶ 3}  In May 2023, Coyne filed a motion to suppress, seeking to exclude (1) all evidence gathered as a result of the stop of Coyne's vehicle; (2) tests of Coyne's coordination and intoxication level, including bodily substance tests; (3) Coyne's statements; (4) observations and opinions of the officers involved; (5) and any and all evidence obtained as a result of Coyne's purported illegal, warrantless seizure. Coyne argued that this "illegally and unconstitutionally obtained" evidence should be suppressed because the initial seizure was accomplished in the absence of any reasonable and articulable suspicion that Coyne had violated, was violating, or was about to violate any traffic law and contravened R.C. 2935.03 and 2935.04.  As a result, Coyne claimed he was subjected to an unreasonable seizure, contrary to his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution and Article 1, Section 14 of the Ohio Constitution.  Coyne further argued that absent this evidence, there was no lawful cause to detain Coyne or probable cause to arrest him without a warrant.

{¶ 4} In June 2023, a hearing was held on Coyne's motion to suppress. The following evidence was adduced at the hearing. In February 2022, Shawn Bolling ("Bolling") called 9-1-1 and informed the dispatcher that "there's somebody that refuses to leave my mom's apartment. He's belligerent, he's drunk, he's threatening me and my mom." (06/28/23, Tr. 38.) Bolling identified Coyne, his mother's boyfriend, in the call and advised that Coyne was "threatening to be" physically aggressive. *Id.* At the end of the call, Bolling informed the dispatcher that Coyne "just left" and he believed Coyne was in a vehicle, although he did not know what kind of vehicle Coyne drove and could not provide Coyne's physical description. *Id.* at 39. Bolling then ended the call, saying, "I'm not trying to deal with this . . . right now." *Id.* at 40.

{¶ 5} The radio-transmission recordings between Parma dispatch and responding officers and computer-aided dispatch report ("CAD Report") associated with the call revealed the following timeline of events. At 11:32 p.m., dispatch radioed, "Male is intoxicated and belligerent, believed to be a Steve Coyne, threatening to be physically aggressive." *Id.* at 16, 20. Two minutes later, at 11:34 p.m., dispatch indicated that "the male just walked out the door." *Id.* at 18, 21. At the suppression hearing, Officer Bertole, the responding officer who ultimately stopped and arrested Coyne, advised that he had not reached the apartment or encountered Coyne at that time. Officer Bertole explained that while the disturbance was "not active," officers were still responding to the address to

investigate whether a crime occurred since "[the caller] wanted us to come there because they called 9-1-1" and "we're obligated to respond." *Id.* at 21-22.

{¶ 6} Descriptions of Coyne and his vehicle, a gray Ford Edge, were then provided by dispatch over the radio, along with Coyne's license plate number. At 11:38 p.m., Officer Bertole located a vehicle matching dispatch's description at the intersection of Snow Road and Stumph Road/Chevrolet Boulevard while enroute to the Stumph Road apartment. Officer Bertole indicated to dispatch that he was going to stop the gray Ford Edge and speak with the driver.

{¶ 7} Officer Bertole explained the events in February 2022 leading up to Coyne's arrest as follows:

> We received a call for service. It was a report of a disturbance at an apartment on Stumph Road. The male was being verbally abusive, I think they said threatening to be physical.
>
> As I was responding, I saw a vehicle that matched the description g[iven] by our dispatch. I got behind it and ran the license plate, I believe, which showed me that it was, in fact, the male in question. And I chose to stop the vehicle as part of the investigation into what happened at Stumph Road.

*Id.* at 8. Officer Bertole stated that he had not witnessed a traffic violation when he turned on his overhead lights and initiated the traffic stop; rather, he was pulling the vehicle over only because of what he heard about the 9-1-1 call from dispatch. Officer Bertole claimed that at the time he initiated the traffic stop, it was not an OVI investigation; instead, he was investigating the 9-1-1 call.

{¶ 8} Officer Bertole observed Coyne slurring his speech and he noticed that Coyne's eyes were "pretty glassy." *Id.* at 10. Officer Bertole stated:

> I asked [Coyne] if he had been drinking and he admitted that he was, in fact, drinking earlier. And multiple times he told me that he knew he shouldn't be driving. I was asking him what was going on at the apartment. And they had an argument of some sort, if I recall. He just wanted to leave, remove himself from the situation before anything else happened.

*Id.* As a result of his conversations with and observations of Coyne, Officer Bertole asked him to step out of the vehicle and perform field sobriety tests. Coyne was either unable to complete the tests or showed clues of intoxication.

{¶ 9} While Officer Bertole was conducting his traffic stop in front of the UAW Hall, another officer advised over the radio that "after speaking to the caller it sounds like it was verbal, he's okay with just the man leaving for tonight . . . ." *Id.* at 28. At the suppression hearing, Bolling explained that he spoke to a police officer after his initial call with dispatch and "informed him on the phone call that I did not want to deal with the situation any longer, situation was resolved. He left peacefully, nothing had happened, and the situation was done. I deemed it over the moment [Coyne] closed the door." *Id.* at 46. Bolling said that he did not tell police officers to investigate further or to press charges and no actual physical violence occurred between him and Coyne.

{¶ 10} In August 2023, the trial court ruled on Coyne's motion to suppress and issued a judgment entry with findings of fact and conclusions of law. In holding that "the police had reasonable suspicion to encounter and engage [Coyne] notwithstanding the lack of an observed traffic violation[,]" the trial court found:

> The officers were dispatched regarding a citizen complaint by an identified phone caller, indicating a situation needing police response.

This included references to the aggressive and intoxicated behavior of [Coyne]. The initial dispatch of officers was relative to a possible disturbance situation. Police were further advised that [Coyne] had left the residence and had left in his [gray] Ford Edge. [Officer] Bertol[e] encountered [Coyne] and engaged in a traffic stop at the UAW Hall on Stump/Chevrolet, which is not a long distance from the address of the call, and is consistent with [Coyne] leaving and going northbound, in a contemporaneous time frame with the call. The officers had the right to detain [Coyne] for further investigation as it relates to the initial call of a disturbance at the apartment.

(Judgment Entry, 08/31/23.) The trial court then held that the police had reasonable suspicion to engage in further investigation regarding a possible OVI given the information provided by dispatch and Officer Bertole's observation of signs of possible impairment, including slurred speech and Coyne's admission that he was drinking earlier. *Id.* Finally, the trial court held that police had probable cause to arrest Coyne for an OVI violation, finding:

The initial call [from] the apartment indicated that [Coyne] was drunk. He was stopped in a motor vehicle, having operated the same from the apartment to the stopping point near the UAW Hall. [Officer] Bertol[e] noticed indicia of alcohol consumption, including [Coyne's] own admission. The [one field sobriety test], which appears to be properly conducted, resulted in six clues; raising a presumption that [Coyne] would test over .08 if he tested. [The other two tests] were unable to be completed, due to [Coyne's] inability to complete the tests.

*Id.* Based on the foregoing, the trial court denied Coyne's motion to suppress and set the matter for a final pretrial and trial.

{¶ 11} At the final pretrial in October 2023, Coyne entered a plea of no contest to the OVI charge. The trial court accepted Coyne's plea and found him guilty. A sentencing hearing was held on November 6, 2023, and a journal entry memorializing his sentence was docketed on December 6, 2023.

{¶ 12} In the interim, Coyne filed the instant appeal and sentencing matters were stayed pending resolution.  Coyne raises two assignments of error for review.

**Assignment of Error No. 1**

The trial court's findings of fact were against the manifest weight of the evidence.

**Assignment of Error No. 2**

The trial court erred when it denied [Coyne's] motion to suppress, holding in error that the police had reasonable suspicion to initiate a traffic stop, without any observed traffic violations, to investigate a telephoned complaint to police of a disturbance at an apartment.

## II.   Law and Analysis

### A. Suppression Overview

{¶ 13} The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution guarantee "the right of people to be secure in their persons, houses, papers, and effects [or possessions], against unreasonable searches and seizures."  Evidence obtained in violation of these constitutional prohibitions is considered "fruit of the poisonous tree" and must be suppressed from use in the criminal prosecution of the person from whom it was obtained.  *State v. Parrish*, 2023-Ohio-3356, ¶ 12 (8th Dist.), citing *State v. Boulis*, 2006-Ohio-3693, ¶ 12, 22 (8th Dist.).  "'The purpose of suppression is not to vindicate the rights of the accused person, who may very well have engaged in illegal conduct, but to deter the state from such acts in the future.'"  *Id.*, quoting *State v Stagger*, 2005-Ohio-4586, ¶ 11 (8th Dist.).  This purpose should not be overshadowed by confirmation of the

detained person's commission of an alleged criminal act. *Id.*, citing *State v. Byrd*, 2022-Ohio-4635, ¶ 32 (8th Dist.).

## B. Standard of Review

{¶ 14} Appellate review of a motion to suppress generally presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court is in the best position to evaluate the evidence and the credibility of witnesses and, therefore, assumes the role of trier of fact when considering a motion to suppress. *Id.* On appeal, an appellate court must accept the trial court's findings of fact as true so long as they are supported by competent, credible evidence. *Id.* The appellate court must then apply the de novo standard of review to the trial court's conclusions of law, independently determining whether the facts satisfy the applicable legal standard without deference to the trial court's legal conclusions. *Id.*

{¶ 15} When a defendant raises a manifest-weight challenge, the appellate court must review the entire record, weigh all evidence and reasonable inferences, and consider witness credibility to determine whether the factfinder clearly lost its way in its resolution of evidentiary conflicts and created a manifest miscarriage of justice. *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, (1997). But "[i]n conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess." *Cleveland v. Giering*, 2017-Ohio-8059, ¶ 36

(8th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraphs one and two of the syllabus.

{¶ 16} With these principles in mind, we jointly review Coyne's two assignments of error concerning the trial court's factual findings and legal conclusions resulting in the denial of his motion to suppress.

### C. Denial of Motion to Suppress

{¶ 17} In his first assignment of error, Coyne argues that the trial court's findings of fact were incomplete and against the manifest weight of the evidence. In his second assignment of error, Coyne asserts that the trial court erred by denying his pretrial motion to suppress because the trial court failed to apply relevant state and federal caselaw to the facts of this case. Coyne further argues that any reasonable suspicion arising from the 9-1-1 call ceased once Bolling advised that the situation was over and voluntarily terminated the call. Finally, Coyne claims that there was no probable cause for his arrest because all evidence gathered from the "unjustified traffic stop" was "illegally obtained" and subject to suppression.

{¶ 18} The Fourth Amendment applies to seizures of a person, including brief investigatory stops of persons in a vehicle. *Navarette v. California*, 572 U.S. 393, 396 (2014); *Whren v. United States*, 517 U.S. 806, 809 (1996); *United States v. Cortez*, 449 U.S. 411, 417 (1981). When a police officer has a reasonable suspicion that the person being stopped has or is engaged in criminal activity, an investigatory stop, or *Terry* stop, does not violate the Fourth Amendment. *Fairview Park v.*

*Bowman*, 2023-Ohio-4210, ¶ 52 (8th Dist.), citing *State v. Jones*, 2014-Ohio-2763, ¶ 17 (8th Dist.).

{¶ 19} When determining whether reasonable suspicion exists for purposes of an investigatory stop, the need for the search or seizure must be balanced against the search's invasion upon constitutionally protected interests. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). To justify a particular intrusion, "the police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* Thus, reasonable suspicion involves more than "inchoate and unparticularized suspicion" or a mere "hunch," but less than the level of suspicion required for probable cause. *Id.* at 27. This "reasonableness" determination hinges upon objective factors, rather than the actual subjective motivation of the officer involved. *In re E.H.*, 2019-Ohio-2572, ¶ 24 (8th Dist.), citing *Whren* at 813. Finally, the "totality of the circumstances — the whole picture" must be considered when evaluating whether a detaining officer had the required "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez* at 417-418.

{¶ 20} In the instant case, Officer Bertole's decision to stop Coyne was based solely on the information provided by Bolling in his 9-1-1 call. Both the Ohio and United States Supreme Courts have held that a reliable tip, standing alone, may provide a reasonable, articulable suspicion to justify an investigatory stop. In *Maumee v. Weisner,* 87 Ohio St.3d 295 (1999), paragraph two of the syllabus, the Ohio Supreme Court held that a telephone tip can create reasonable suspicion

justifying an investigative stop if the tip has sufficient indicia of reliability. Under these circumstances, the determination of reasonable suspicion is limited to an examination of the weight and reliability of that tip. *Id.* at 299. "[T]he informant's veracity, reliability, and basis of knowledge" are highly relevant factors in determining the tip's value. *Id., citing Alabama v. White*, 496 U.S. 325, 328 (1990). Citing caselaw from federal and Ohio appellate courts, the Ohio Supreme Court explained that tips initiating from identified citizen informants that are reported immediately and based on personal observations are afforded greater credibility, reliability, and accuracy. *Id.* at 300-302.

{¶ 21} Similarly, in *Navarette v. California,* 572 U.S. 393, 399-400 (2014), a case involving an anonymous tip that created a reasonable suspicion of drunk driving, the U.S. Supreme Court found that eyewitness knowledge and contemporaneous reporting lend significant support to a tip's reliability. The U.S. Supreme Court further found that the caller's use of the 9-1-1 emergency system was another indicator of veracity, noting, "A 9-1-1 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.* at 400-401. The *Navarette* Court cautioned that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Id.* at 401, quoting *Terry* at 30. However, subsequent innocent conduct or the absence of suspicious conduct does not dispel reasonable suspicion of criminal activity. *Id.* at 403. Therefore, "an

officer who already has a reasonable suspicion need not surveil a vehicle at length in order to personally observe suspicious driving." *Id.* at 404.

{¶ 22} In reviewing the totality of the circumstances, we find that Bolling's tip had sufficient indicia of reliability. Bolling called 9-1-1 and advised the dispatcher that Coyne refused to leave his mother's Stumph Road apartment and was belligerent, drunk, and threatening to be physically violent with him and his mother. Coyne does not challenge the trial court's finding that Bolling was an "identified phone caller" and his name and redacted telephone number appear on the CAD Report. Bolstering the tip's credibility, reliability, and accuracy, the record reveals that Bolling utilized the 9-1-1 reporting system, possessed eyewitness knowledge, and his call was made contemporaneously with the events that transpired at the Stumph Road apartment. Bolling remained on the line with dispatch until he believed Coyne left the apartment in a vehicle. Bolling's initial report that Coyne was belligerent, intoxicated, and threatening to be physically aggressive became a matter of public safety after Coyne left the apartment and began driving a vehicle. Thus, based on Bolling's 9-1-1 call, it was objectively reasonable to suspect that a crime occurred not only at the Stumph Road apartment, but was currently in progress on public roadways. Accordingly, Bolling's reliable tip provided a sufficient basis to develop reasonable suspicion justifying Officer Bertole's investigatory stop of Coyne, who was identified by Bolling and located while driving a vehicle matching the description provided by dispatch near the Stumph Road apartment where the disturbance occurred. Because an objectively reasonable and articulable suspicion

was created by Bolling's tip, Officer Bertole was not required to surveil Coyne's vehicle or personally observe suspicious driving prior to pulling him over.

{¶ 23} Coyne claims that the trial court clearly lost its way and created a manifest miscarriage of justice by omitting "critical factual details," including the timeline of events, the specific allegations made by the caller, the way the caller ended the 9-1-1 call, and that the caller did not wish for police to pursue the matter any further. However, Coyne fails to make a cognizable argument that the trial court's "factual omissions" resulted in a manifest miscarriage of justice. Coyne does not explain why the purported "factual omissions" are critical in the weighing of evidence, establish how the trial court clearly lost its way in its resolution of evidentiary conflicts, or cite any caselaw in support of his assertion that, because searches and seizures are notoriously fact-sensitive, "it is essential that a trial court articulate all of the specific facts that it relied upon to reach its determination." Despite Coyne's contentions, our review of the August 31, 2023 judgment entry reveals that the trial court accounted for the specific facts it relied upon in denying Coyne's motion to suppress and, as discussed above, those facts were consistent with the evidence presented at the suppression hearing. Based on the record before us, the trial court's factual findings are supported by competent, credible evidence within the record and there is no indication that the trial court, as the finder of fact, lost its way or created a manifest miscarriage of justice by omitting the alleged "critical factual details."

{¶ 24} Coyne also claims that the trial court erred by failing to consider or apply *State v. Amburgy*, 122 Ohio App.3d 277 (12th Dist. 1997), which he believes has "a striking factual and legal similarity" to this case. However, *Amburgy* is clearly distinguishable. In *Amburgy*, the informant did not claim that the defendant was belligerent, intoxicated, or threatening physical violence. Rather, the informant reported that she wanted the defendant to leave her home and that he may have returned to pick up drugs. *Id.* at 279. The informant did not see what was picked up — she merely thought it to be drugs — nor did she state that she saw the defendant in her home. *Id.* at 281. The Twelfth District Court of Appeals found that the informant's tip was based on speculation, not upon personal knowledge, and absent other facts showing that the officers had a particularized and objective basis for suspecting that the defendant possessed drugs, the officers did not have a reasonable suspicion to stop the defendant. *Id.* at 281.

{¶ 25} Unlike *Amburgy*, this case involves a reliable tip; Bolling provided a real-time, firsthand account of specific and articulable facts that created reasonable suspicion that a crime had occurred or was occurring because of Coyne's belligerence, intoxication, and threats. As previously discussed, Bolling's tip alone was sufficient to justify the stop of Coyne's vehicle. *See, e.g.*, *State v. McKinney*, 2016-Ohio-5737 (5th Dist.). (holding that a reliable informant's report of the defendant's harassment, potential stalking, and possible intoxicated driving was sufficient to justify the investigatory stop of the defendant's vehicle, resulting in his arrest for an OVI, without further indicia of drunk driving).

{¶ 26} The caselaw cited by Coyne in support of his argument that reasonable suspicion ceased once the 9-1-1 call terminated is also distinguishable: they involve suspected equipment or license violations that proved to be unsubstantiated upon investigation. And the principle cited by Coyne that "[a]n officer's reasonable suspicion that a traffic violation occurred terminates when the officer recognizes the grounds for effectuating the stop are no longer valid[,]" does not apply to this case. Here, Officer Bertole was investigating Bolling's 9-1-1 call, which reported that Coyne was belligerent, drunk, and threatening to be physically aggressive. Coyne's reported condition did not "cease" because Bolling ended his 9-1-1 call to dispatch, saying he was "not trying to deal with this . . . right now," or because Coyne left the Stumph Road apartment. Nor was Officer Bertole required to disregard his personal observations during the investigatory stop after he received word that the disturbance at the Stumph Road apartment was verbal in nature and Bolling was "okay with just the man leaving for tonight." Rather, Officer Bertole's observations of Coyne's intoxication, Coyne's own admissions that he was drinking and should not be driving, and subsequent field sobriety tests substantiated the reasonable suspicion arising from Bolling's 9-1-1 call, leading to Coyne's OVI arrest. Therefore, Coyne's arguments are without merit, and we find that Officer Bertole's investigatory stop of Coyne was based upon reasonable suspicion deriving from Bolling's reliable tip.

{¶ 27} Finally, Coyne does not argue that his arrest lacked probable cause in light of Officer Bertole's observations, Coyne's admissions, and the field sobriety test

results. Rather, he claims Officer Bertole lacked probable cause to arrest him for an OVI because this evidence, obtained after an "illegal stop," must be suppressed. Because we find that reasonable suspicion justified the investigatory stop, we cannot say that the evidence gathered thereafter is "fruit of the poisonous tree" requiring suppression. Accordingly, we overrule both of Coyne's assignments of error and affirm the trial court's denial of Coyne's motion to suppress.

{¶ 28} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Parma Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR